148 So. 242

**SMITH v. CHAPPELL.**

No. 31478.

May 1, 1933.

McHenry, Montgomery, Lamkin & Lamkin, of Monroe, for appellant.

Sholars & Gunby and Hudson, Potts & Bernstein, all of Monroe, for appellee.

ODOM, Justice.

This is a petitory action in which is involved the ownership of a lot of ground in the city of West Monroe, described as follows:

"That part of Lot 'A' of Austin & Eby's First Northern Addition to the town of West Monroe, Louisiana, as per plat of same made by W. E. Atkinson, C. E., on file and of record in the office of the Clerk and Recorded in and for the Parish of Ouachita, Louisiana; beginning on the east line of Trenton Street three hundred and sixty-four feet from the southeast intersection of Trenton and Vernon Streets; thence in a southerly direction along the east line of Trenton Street thirty-two (32) feet; thence back between parallel lines, which lines are parallel to the south side of

Vernon Street extended to the Ouachita River."

Plaintiff alleges that he, Fred Mitchell, Tom Simonton, and C. E. Granberry, jointly, acquired this property from Mrs. Stella C. Eby and Mrs. Martha C. Austin on February 14, 1920, as per deed recorded in the conveyance records of Ouachita parish, and that he subsequently acquired the interest of his co-owners as per deeds duly recorded.

Defendant in answer denied that plaintiff is the owner of the property, and especially alleged that the deed from Mrs. Eby and Mrs. Austin to plaintiff and the others upon which plaintiff now relies, did not convey to them the particular lot of ground in controversy. He set up title in himself alleging that he purchased the property on May 26, 1924, from the West Side Lumber Company, as per recorded deed, which company acquired from Mrs. Eby and Mrs. Austin on February 5, 1921; Mrs. Eby and Mrs. Austin being the authors of plaintiff's title. He alleged that he was in possession of the property and had been since he acquired it in 1924, and had, to the knowledge of plaintiff, erected costly buildings thereon without protest from plaintiff, who, it is alleged, is now estopped to assert title thereto. There was judgment in the district court in favor of plaintiff, decreeing him to be the owner of the property, from which judgment defendant appealed.

█ 1. A petitory action is one brought by an alleged owner of real estate who is out of possession against another having possession to determine ownership. The settled jurisprudence of this state is that a plaintiff in a petitory action, in order to recover, must rely on the strength of his own title and not on the weakness of that of his adversary. In order to maintain his suit, he carries the burden of proving title in himself. The title of the defendant is not an issue until plaintiff has proved an apparently valid title in himself. Capra v. Viola, 172 La. 731, 135 So. 41; Mecom v. Graves, 148 La. 369, 374, 86 So. 917; Waddill v. Walton, 42 La. Ann. 763, 7 So. 737; Doiron v. Locke, Moore & Co., 165 La. 57, 115 So. 366; New Orleans v. Union Lumber Co., 145 La. 476, 82 So. 588; Glover v. Haley, 118 La. 649, 43 So. 265; Lowenburg, Marks & Co. v. H. & C. Newman, 142 La. 959, 77 So. 891; Nilson v. Brinkerhoff, 146 La. 697, 83 So. 902; Bruton v. Braselton, 157 La. 64, 101 So. 873; Land v. Brockett, 162 La. 519, 110 So. 740; Pringle v. Price, 170 La. 343, 127 So. 745; Wilfert v. Duson, 131 La. 21, 58 So. 1019; Hemken v. Brittain, 12 Rob. 46.

█ From this rule it follows necessarily that, when a plaintiff claims title to a certain described lot of ground, he must show that his title covers the identical lot in controversy. Hemkin v. Brittain, supra, and Murray v. Boissier, 10 Mart. (O. S.) 293; Frere v. Derouen, 104 La. 777, 29 So. 330; Bayard v. Baldwin Lbr. Co., 157 La. 994, 103 So. 290; Ducre v. Milner, 165 La. 433, 434, 115 So. 646.

Plaintiff owns whatever property was conveyed by Mrs. Eby and Mrs. Austin to him, Mitchell, Simonton, and Granberry on February 14, 1920; he having subsequently acquired the interest therein of his co-owners under deeds containing descriptions identical with that in the original deed. Plaintiff's case therefore hinges on the question whether the Eby and Austin deed conveyed the particular lot of ground in controversy. If it did

not, then plaintiff has no title and no case. The title of defendant is not an issue in the case unless plaintiff can prove an apparently valid title in himself.

Plaintiff, in order to establish title in himself, introduced in evidence the deed from Mrs. Eby and Mrs. Austin to himself, Mitchell, Simonton, and Granberry and deeds from his former co-owners to himself. The description in the Eby and Austin deed is as follows:

"That part of lot 'A' of Austin and Eby's first northern addition to the town of West Monroe, La., as per plat of same made by W. E. Atkinson, C. E., on file and recorded in the office of the clerk and recorder of Ouachita Parish, La., beginning at the southeast intersection of Trenton Street and Vernon Street, thence in a southerly direction along the east side of Trenton Street, 396 feet; thence back between parallel lines, one of which is the south line of Vernon Street extended to the Ouachita River; being all the equity, riparian rights, or other title to said lot or parcel of land as held by these vendors in that portion directly opposite lots 10, 11, 12 and 13 of block 8, same addition, now owned by these vendees."

The Atkinson plat referred to in the deed shows that Trenton street runs approximately north and south near the bank of the river and that Vernon street intersects Trenton at near right angles. Lot A of the subdivision as shown by the plat is all the ground between the east line of Trenton street and the river, bounded as follows: By a line beginning at the southeast intersection of Trenton and Vernon streets and running south along the eastern edge of Trenton street 406.23 feet; thence east from the east

line of Trenton street to the river; thence in a northerly direction along the meanderings of the river bank to a line formed by extending the south line of Vernon street across Trenton street to the river; thence in a westerly direction to Trenton street.

Block 8 of this subdivision, as shown by the plat, which block and lots 10, 11, 12, and 13 thereof, are referred to in the deed, is on the west side of Trenton street opposite lot A. Block 8 is bounded on the north by the south line of Vernon street, on the east by the west line of Trenton street, and on the south by Stella street. It has a frontage on Trenton street of 454.14 feet and this frontage is subdivided into five lots numbered from south toward the north, 9, 10, 11, 12, and 13; each of the lots having a width of 91 feet, except lot 9, the southern lot, which has a width of 90.14 feet. Lot 13 of block 8 is bounded on the north by the south line of Vernon street, and the north boundary line of block A is an imaginary line formed by projecting the north boundary line of lot 13 across Trenton street to the river, so that the northwest corner of lot A, which is the starting point of the description in the deed from Mrs. Eby and Mrs. Austin to plaintiff and the others named in the deed, is on the opposite side of Trenton street and east of the northeast corner of lot 13.

One of the calls in the Eby and Austin deed is for a distance of 396 feet along the eastern edge of Trenton street beginning at a point at the southeast intersection of Trenton and Vernon streets, which, as we have said, is the northwest corner of lot A. It is contended by plaintiff that he and the other vendees in the Eby and Austin deed, pur-

chased all of lot A fronting on Trenton street from the northern boundary thereof south to a distance of 396 feet. If this be true, the plaintiff unquestionably owns the lot in controversy, which is included within this description. A short description of the lot involved is "the south 32 feet of that part of lot 'A' which plaintiff claims that he and others purchased from Eby and Austin." This is the lot of ground which defendant claims to own and on which he has erected a garage and filling station at an expense of something like $8,000.

If the description in the Eby and Austin deed had stopped after stating the distance along Trenton street, this controversy could not have arisen because plaintiff's deed is prior in date to that under which defendant claims; the question of prescription not being involved. But that deed goes further in describing the property, and recites:

"Being all the equity, riparian rights, or title to said lot or parcel of land as held by these vendors in that portion directly opposite lots 10, 11, 12 and 13 of block #8, same addition, now owned by these vendees."

At the time this sale was made to Smith, the plaintiff, and to Mitchell, Simonton, and Granberry, Smith owned lot 10, Simonton lot 11, Mitchell lot 12, and Granberry lot 13 of block 8. Each had a residence on the lot owned by him in which he was residing. This fact is material as we shall presently show.

The question then arises whether the subsequent clause in the description prevails over that part which calls for a specified distance. The two calls in the deed are irreconcilable. They cannot both stand. One or the other must fall. Lots 10, 11, 12, and 13 of block 8 have a combined frontage of exactly 364 feet on Trenton street, which is 32 feet less than the distance called for in the deed. The subsequent clause of the description recites that the property sold, being a part of lot A, "is that portion directly opposite lots 10, 11, 12 and 13 of block #8."

That portion of lot A directly opposite these lots has a frontage of only 364 feet, because that is the combined frontage of those lots on that street on the opposite side.

That portion of lot A directly opposite lots 10, 11, 12, and 13 of block 8 is all that portion of it bounded on the south by a line produced by projecting or extending the south line of lot 10 across Trenton street to the river, and bounded on the north by a line produced by projecting the north line of lot 13 across that street to the river. In other words, it is that portion of lot A which would be included in lots 10, 11, 12, and 13 if those lots were extended across the street to the river.

An act of the Pennsylvania Legislature incorporated a ferryboat company and prohibited any other from rowing or towing any boat for hire in a certain river to or from any point "opposite the town" named. In the case of Sunbury Steam Ferry & Tow Boat Co. v. Grant (Pa.) reported in 15 A. 706, the court was called upon to interpret the meaning of the words "opposite the town," and it was said that the part of the river "opposite the town" meant that portion of it and its banks "which the town would come in contact with if it were moved straight across the river."

▐▬▬▬▬▬▬▬▬▬▬▬▌

The ruling in that case is an apt illustration of the point involved here. Our interpretation of the meaning of the clause, "that portion directly opposite lots 10, 11, 12 and 13 of block #8," is that it means that portion of lot A which would come in contact with said lots if they were moved or shoved across the street to the river.

The word "opposite" as used in this deed is preceded by the word "directly." "The word 'directly' is derived from the Latin 'directus,' straight, past participle of 'dirigere,' to set in a straight line. The primary idea is of space—in a straight line, rectilinearly, undeviating, etc. All the secondary meanings are analogous to the idea of straightness in space." 3 Words and Phrases, First Series, 2076, verbo, "Directly."

The word "opposite" means "set over against." "With respect to a given line, two points are opposite when their connecting line would cross it at right angles; in a circle two points in the circumference are opposite only when at the ends of a diameter." Webster.

Lot 10 is the southern of the four lots mentioned in block 8. If one should stand on the southern edge of that lot and look straight ahead east, or the direction pointed by its north and south boundary lines, he would not see any part of the lot in controversy. That lot would be to his right. He could see it only by looking at an angle. The lot is not "directly opposite" the lots referred to in the deed.

Another significant feature of the latter part of this description is that the vendors sell all their rights, titles, etc., "in that portion" directly opposite said lots. This further indicates that the vendors intended to be specific and to exclude from the sale any portion of lot A not directly opposite the designated lots in block 8. It is reasonable to assume that, if it had been intended that the purpose of the latter part of the description was merely to point out the general direction the property sold was from the lots in block 8, it would have been stated that the property sold was across the street or in an easterly direction from those lots. But instead it is recited that the property sold is "in that portion," meaning that portion of lot A, "directly opposite" the designated lots in block 8.

▐▬▬▌ The purpose of the description in a deed of conveyance is to identify the subject-matter of the grant, and, where there are two descriptions, they should be reconciled and harmonized, if possible. It must be assumed that no part of the description was inserted by chance, but, on the contrary, that each word, each phrase, each clause, was intended to have some meaning, and, where there are conflicting descriptions which cannot be harmonized, then a construction must be adopted which best comports with the intention of the parties, keeping in mind always the circumstances which controlled or influenced the contract.

▐▬▌ We quote with approval from 13 Cyc. 627, the following rule for the interpretation of descriptions in deeds:

"c. *Entire Description Should be Considered.* The entire description in a deed should be considered in determining the identity of the land conveyed. Clauses inserted in a deed should be regarded as inserted for a purpose and should be given a meaning that will aid the description. Every part of a

deed ought if possible to take effect and every word to operate.

"d. *Inconsistent Recitals.* If recitals in a deed are inconsistent or repugnant the first recital does not necessarily prevail over the latter, but the whole language of the deed is to be construed together in order that the true construction may be ascertained. In such a case the court will look into the surrounding facts and will adopt that construction which is the most definite and certain and which will carry out the evident intention of the parties. And if the land conveyed is sufficiently identified by certain parts of the description an impossible or senseless course should be disregarded, and the deed sustained.

"3. *Ambiguous Description.* Where the description of the property intended to be conveyed is ambiguous the identity of such property must be gathered from the intention of the parties as shown by the instrument itself and the accompanying circumstances such as those surrounding and connected with the parties and the land at the time. Words may if necessary be qualified by intendment and particular clauses and provisions qualified, transferred, or rejected in order to ascertain the intention."

As regards the position of the different clauses in the description, whether effect should be given to the first or the second, the general rule is stated as follows in 8 Ruling Case Law, 1044:

"It seems that generally courts of the present day do not feel bound, in any case, to give effect to the first of two repugnant parts of a deed merely because of its position in

the instrument, but rather to effectuate the one, be it first or last, which appears, from an examination of the whole deed, most in harmony with the purpose of the grant and the intention of the parties."

Where, as in this case, there are conflicting calls in the deed, and where the first call is followed by a general description which manifestly was intended to be a summing up of the intention of the parties as to the premises conveyed, such general description controls all prior words or phrases used, if sufficient to identify with certainty the premises conveyed.

The defendant, Chappell, filed answer in which it was alleged that the insertion of the figures "396" in the Eby and Austin deed was a mistake, an error of fact, and that the vendors intended to convey and the vendees to purchase only so much of lot A as lay directly opposite lots 10, 11, 12, and 13 of block 8, or 364 feet. He further alleged that the purpose of the vendees in purchasing the property was to protect their view of the river from their residences built on the said lots in block 8. Having alleged that there was error and mistake in the figures used in the deed, he offered parol testimony to show this and to show the true intent of the parties. This testimony was objected to on the ground that parol testimony is not admissible "against or beyond what is contained in the acts, nor on what may have been said before, or at the time of making them, or since" (C. C. art. 2276), or to reform or correct a deed.

Counsel in their brief cite numerous cases in support of the general rule stated. But that general rule has no application here for two

reasons. One is that Chappell, the defendant, was a stranger to the deed from Mrs. Eby and Mrs. Austin to plaintiff and the other vendees named therein, and it is settled beyond controversy that the "parol evidence rule, declared by Rev. Civ. Code, art. 2276, applies only between parties to the act and their representatives and not between a party to the act and third persons." W. K. Henderson Iron Works & Supply Co. v. Jeffries, 159 La. 620, 105 So. 792; Commercial Germania Trust & Savings Bank v. White, 145 La. 54, 81 So. 753; Ford v. Parsons et al., 142 La. 1093, 78 So. 128.

■ Numerous other cases might be cited. The other reason, and this is the principal one, is that the testimony was not offered to contradict or reform the deed, but to show that there was mistake and error in that part of the description setting out the number of feet and to show the true intent of the parties as to the description of the land conveyed.

It is well settled that parol testimony is admissible to show errors in the description of property sold. In Levy v. Ward, 33 La. Ann. 1033, Chief Justice Bermudez, as the organ of the court, said:

"The reception of parol testimony to establish a clerical error, almost patent in the description of land contained in the deed, as also to explain lurking ambiguities, to identify the property, to prove fraud practiced in the transfer of land, to show possession, to show boundaries, is no infringement of the rule which demands that title to real estate be evidenced in writing only."

In Fleming & Baldwin v. Scott, 26 La. Ann. 545, the objection was made that parol evidence should not be received to prove error in description of the lands sold. The court held that such evidence was admissible, and that, if such were not true, "it would be unfortunate indeed, for there could hardly be any other mode to prove a wrong description."

In Vignie v. Bradley et al., 35 La. Ann. 560, it was held that parol testimony is admissible to prove a mistake in a description of lands set out in a deed of conveyance, where error is alleged, and even to show that a tract of land described therein was not sold, or intended to be conveyed by the deed.

In the case of Lattimer's Heirs v. Gulf Refining Co., 146 La. 249, 83 So. 543, it was held that, "Even where the subject of a sale is real estate and the sale is a judicial one, an error in the description of the thing actually sold may be shown by parol." (Point 2, syllabus.) See, also, Sims v. Jeter, 129 La. 262, 266, 55 So. 877, and Waller v. Colvin, 151 La. 765, 92 So. 328.

■ As to the intention of the parties, the rule is that "the real intention of the parties is to be sought and carried out whenever possible" (8 Ruling Case Law, 1037), and "it is well settled that deeds must be construed so as to effectuate if possible the intention of the parties" (13 Cyc. 601).

As there was a specific allegation of mistake and error in part of the description, it was permissible for defendant to show that by parol testimony if he could.

Referring now to the parol offered, we find that E. S. Eby, husband of Mrs. Eby, acted for his wife and Mrs. Austin, Mrs. Eby's sister, in making the sale to plaintiff, Mitchell,

Simonton, and Granberry, and that Mitchell acted for his associates. All the negotiations were carried on by Eby and Mitchell. Eby testified that the vendors intended to sell only that part of lot A which lies directly opposite lots 10, 11, 12, and 13 of block 8, and that he personally drew the deed and inserted 396 feet through error. He says the cause of the error was that he did not have the plat before him at the time, and that he was under the impression that each of the lots in block 8 had a frontage of 99 feet instead of 91 feet. He says he intended to include only such footage as the four lots across the street had, 364. Mrs. Eby and T. J. Austin, husband of Mrs. Austin, who died before the trial, testified to the same effect.

Fred Mitchell, who carried on the negotiations with E. S. Eby, testified that he understood that he and his associates were purchasing a lot directly opposite their property in block 8. He was asked:

"Q. Where Mr. Mitchell, did you consider the south line of the property was that you were buying?

"A. Directly in front of our property, we were buying in front of us four, starting at Vernon Street and coming down to the south line of Smith's property."

Smith owned lot 10 of block 8, the southern of the four lots. Mitchell was asked if he knew the footage of the property purchased, and he said, "Yes sir, each lot was ninety-one feet; four times that."

Simonton was dead at the time of the trial. Smith and Granberry, the other two purchasers, testified. They said they had nothing to do with the negotiations leading up to the purchase; these being conducted by Mitchell. Each said he thought they were buying 396 feet, but they seem to have gotten that idea from the deed. They said they discussed the matter of the purchase with Mitchell, but they did not say that Mitchell told them that they were getting 396 feet. A part of Granberry's testimony indicates that he knew they were to get only the property directly in front of their lots. At the time the deed was signed by the purchasers, the vendors were not present. Smith read the deed and suggested that the latter part of the description should be stricken out as it was in conflict with the part calling for 396 feet. Smith and Granberry decided that the call for footage would control, and they did not ask that the description be changed. Granberry admits that at the time he remarked that they were getting more property than they bought.

Smith and Granberry may have thought, after seeing the deed, that they were purchasing 396 feet. But it is clear that they had no reason to believe, and we seriously doubt if they did believe or understand, that they were to get that much footage. Mitchell is the only one of the purchasers who knew just what the agreement was, and, so far as the testimony reveals, he did not tell the others that they were getting 396 feet. It is certain that the vendors did not intend to sell that much footage.

As to the particular lot in controversy, there was no meeting of the minds, and therefore no sale. Contracts of sale arise from the agreement of the parties. Three circumstances concur to the perfection of a sale, the thing, the price, and consent. C. C. art.

2439. There is no sale unless the parties understand and agree upon the same thing. This is too elementary to need citation of authority to support it.

■ Plaintiff has failed to discharge the burden which the law lays upon him of proving his title, and his suit must fall.

The judgment appealed from is reversed, and plaintiff's demands are rejected, and his suit dismissed, at his costs.